# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

SUSAN HELWIG,

                Plaintiff,

    v.

DANIEL J. MYERS, PH.D., and
MISERICORDIA UNIVERSITY,

                Defendants.

CIVIL ACTION NO. 3:22-CV-01916

(MEHALCHICK, J.)

## MEMORANDUM

Plaintiff Susan Helwig ("Helwig") initiated this action by filing a complaint on December 2, 2022. (Doc. 1). Before the Court is a motion for summary judgment filed by Defendants Daniel J. Myers, Ph.D. ("Myers") and Misericordia University ("Misericordia") (together "Defendants"). (Doc. 42). For the reasons provided herein, Defendants' motion will be **GRANTED in part and DENIED in part**. (Doc. 42).

## I. BACKGROUND AND PROCEDURAL HISTORY

The following background is taken from Defendants' statement of material facts and Helwig's response thereto [1] (Doc. 43; Doc. 58). Misericordia is a not-for-profit private university in Luzerne County, Pennsylvania. (Doc. 43, ¶ 2; Doc. 58, ¶ 2). Misericordia hired Myers as President of Misericordia effective July 1, 2021, and he is the current President of Misericordia. (Doc. 48, ¶ 3, 20; Doc. 53, ¶ 3, 20). In or about 1999, Misericordia hired Helwig,

---

[1] Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. The facts have been taken in the light most favorable to the non-moving party with respect to the motion.

a woman born in 1960, for the position of Vice President of University Advancement. (Doc. 43, ¶¶ 1, 9; Doc. 58, ¶¶ 1, 9). Helwig served as the Vice President of University Advancement at Misericordia until March 9, 2022. (Doc. 43, ¶ 157, 9; Doc. 58, ¶ 157). At all times, Helwig was an at-will employee of Misericordia, meaning Misericordia reserved the right to terminate Helwig "for lawful reasons at any time, with or without cause, and with or without notice." (Doc. 43, ¶¶ 11-12; Doc. 58, ¶¶ 11-12). As Vice President of University Advancement, Helwig reported to Myers, who reported to the Board of Trustees (the "Board"). (Doc. 43, ¶¶ 13, 102; Doc. 58, ¶¶ 13, 102).

Helwig was diagnosed with skin cancer on December 27, 2021. (Doc. 43, ¶¶ 27-28; Doc. 58, ¶¶ 27-28). Helwig underwent a melanoma lesion excision on February 7, 2022. (Doc. 43, ¶¶ 29-30; Doc. 58, ¶¶ 29-30). Defendants assert that Helwig did not tell anybody at Misericordia about her cancer diagnosis, except her assistant, Wendy Ferrara ("Ferrara"). (Doc. 43, ¶ 32). Helwig contends that she disclosed her skin cancer diagnosis to both Ferrara and Pamela Parsnik ("Parsnik"), Director of Human Resources and Title IX Coordinator for Misericordia University, on February 16, 2022. (Doc. 58, ¶ 32). While Defendants assert that Myers was not aware of Helwig's skin cancer diagnosis, Helwig counters that Myers may have learned of Helwig's diagnosis and need for FMLA leave from Parsnik. (Doc. 43, ¶ 33-35; Doc. 58, ¶¶ 33-35).

Myers testified that after he became the President of Misericordia in 2021, a series of incidents occurred in which Myers and Helwig did not see eye-to-eye. (Doc. 43, ¶ 39; Doc. 58, ¶ 39). Defendants consider this series of incidents to be "performance deficiencies" by Helwig. (Doc. 43, ¶¶ 39-40). Helwig denies the characterization her performance as deficient because Myers never disciplined Helwig for any reason nor put her on any sort of performance

improvement plan. (Doc. 58, ¶¶ 39-40). However, it is undisputed that Helwig acknowledged that Myers spoke to her about such performance issues in her communications with Larry Pellegrini ("Pellegrini"), the Associate Vice President of University Advancement at Misericordia. (Doc. 43, ¶ 41; Doc. 58, ¶ 41).

The first in these series of incidents involved a dispute over corporate sponsorship banners for display at Misericordia. (Doc. 43, ¶ 42). Helwig does not characterize the corporate sponsorship banner communications as a dispute. (Doc. 58, ¶ 42). The second incident involved Helwig failing to conform with Myers' instructions when presenting to the Board of Trustees. (Doc. 43, ¶¶ 51-58; Doc. 58, ¶¶ 51-58). Myers told Helwig to take out the references to the short staffing in her report because the Board was already aware of the issue; however, when it came time for Helwig to submit the report to the Board, Helwig refused to remove all references to staffing issues. (Doc. 43, ¶¶ 52-53, 55). Myers testified that he "okayed [Helwig's report] under duress because we were out of time." (Doc. 43, ¶ 57). Helwig counters that her version of the report was okayed by Myers on February 1, 2022, ten days before she reported to the Board. (Doc. 58, ¶ 51). The third incident involved Helwig's allegedly contentious relationship with the Board. (Doc. 43, ¶¶ 59-63; Doc. 58, ¶¶ 59-63). Myers testified that the Board chair, Dr. Debora Smith-Mileski ("Smith-Mileski") and Helwig disagreed about a letter University Advancement drafted regarding the Misericordia gala because Smith-Mileski wanted to focus on gratitude, and Helwig wanted to use the gala as a vehicle for solicitation of donations. (Doc. 43; ¶ 60). Helwig denies that she and Smith-Mileski were "at odds," adding that she explained to Smith-Mileski that the letter was soliciting corporate sponsorships, not soliciting donors invited as part of their giving. (Doc. 58, ¶ 60).

The fourth incident involved an email Helwig sent to Smith-Mileski on February 7, 2022, which Helwig describes as her "line in the sand" and Defendants classify as "the straw that broke the camel's back." (Doc. 43, ¶¶ 64-81; Doc. 58, ¶¶ 64-81). On February 7, 2022, without prior notice to Myers, Helwig sent an email to Smith-Mileski with a copy to Myers stating,

> I know it is meant to be funny, but it has happened often enough now that it has become uncomfortable (and feels like less of a joke), I ask that my name not be mentioned in a negative way at Board meetings re: Trustees making gifts.

> I am happy to be helpful in any way needed, but it really is not the role of the Vice President of Advancement to solicit Trustees or the President. Best practices suggest that Trustees be solicited by their peers. I will join in the visit, or provide the necessary information (whichever is preferred), but I no longer want to be relied on to solicit Trustees at the 11th hour -- nor do I think I should continue to obsess about whether it is getting done.

> Since the elimination of the Marketing and Development Committee, I have become the person chasing down an increasing number of Trustees by phone, email, and text at their homes and offices for the last few months of the fiscal year, trying to get Board giving to the 100% needed for us to be successful with other constituents. It's beyond uncomfortable, and as I sense it is turning into a professional negative, I request things go back to the way best practices suggest they be done.

> Thank you for your understanding.

(Doc. 43, ¶ 64; Doc. 58, ¶ 64).

Helwig forwarded the above email to Pellegrini stating, "I drew my line in the sand. Hopefully this will help." (Doc. 43, ¶ 65). Helwig does not controvert this fact but adds that in the conclusion of the February 7, 2022 email to Smith-Mileski, Helwig expressed that Smith-Mileksi's statement about her made her "uncomfortable" because she is mentioned in a "negative light," and indicates that "this dialogue influences [Helwig's] willingness to help Smith-Mileski." (Doc. 58, ¶ 65). Helwig sent the above email on the same day she underwent excision surgery for the melanoma on her leg. (Doc. 43, ¶¶ 29-30; Doc. 58, ¶¶ 29-30).

4

At 3:05 a.m. on February 8, 2022, after seeing Helwig's email to Smith-Mileski, Myers emailed Helwig stating, "Your tone in this message to Deb is completely inappropriate. We need to talk about this immediately. Let me know when you are free today." (Doc. 43, ¶ 66). Plaintiff denies this fact, asserting that she was never questioned under oath about Myers' February 8, 2022, email. (Doc. 58, ¶ 66). Myers further testified that the solicitation of Board members was a "sore issue for Deb and it is possible to interpret [Helwig's email] as jabbing her about the issue," and that he was embarrassed by Helwig's email to Smith-Mileski. (Doc. 43, ¶ 67). Helwig denies this fact, adding that Myers' testimony is just his perception about how Smith-Mileski might have felt after receiving the February 7, 2022 email. (Doc. 58, ¶ 67). However, it is undisputed that Smith-Mileski described the email as "jabbing" and Helwig's tone as "punitive." (Doc. 43, ¶ 67, 71-72; Doc. 58, ¶ 67).

At 3:11 a.m. on February 8, 2022, Myers emailed Smith-Mileski apologizing for Helwig's February 7th email to Smith-Mileski and noted that he "will be working to correct [Helwig's recent behavior] in one way or another." (Doc. 43, ¶ 69; Doc. 58, ¶ 69). At 6:31 p.m. on February 8, 2022, Myers contacted his executive coach, Dr. Tom Flynn ("Flynn"), a retired university president and professional advisor, who the Board retained to aid Dr. Myers in his first year as President. (Doc. 43, ¶ 76; Doc. 58, ¶ 76). On February 9, 2022, Flynn replied to Myers stating in relevant part,

> [I]t is outrageous that [Helwig] sent the email she did and even worse that she did this without talking with you. The substance and tone are way over the top. Disrespectful to you, as much as to Deb. Not appropriate for me from afar to make a firm judgement, but I dont [sic] see this situation as salvageable. Beyond the relation with Deb, [Helwig] has absolutely broken trust with you. I do think you need to decide this week the next steps.

(Doc. 43, ¶ 79; Doc. 58, ¶ 79).

After receiving input from Flynn, Myers began networking with Flynn and consultants to find a replacement for Helwig and for an assessment of the University Advancement office. (Doc. 43, ¶ 81). Helwig disputes this fact, asserting, without citation to the record, that Myers had not decided to terminate her until March 2022. (Doc. 58, ¶ 81). On February 15, 2022, at Myers' request, Parsnik, Director of Human Resources, provided Myers with information regarding Helwig's employment history in an email with the subject line "Resignation and General Release." (Doc. 43, ¶ 83). Helwig denies this fact, asserting that Parsnik provided Helwig's employment history to Myer because Parsnik believed "he let [Helwig] go." (Doc. 59, ¶ 83). Myers testified that he made the decision to terminate Helwig on or around February 15, 2022, which Helwig denies, asserting that Myers did not provide her with a draft resignation and general release agreement until March 3, 2022. (Doc. 43, ¶ 82; Doc. 58, ¶ 82).

On February 16, 2022, Myers met with Helwig informing her that he intended to terminate her employment and asking her how she wished to characterize her departure. (Doc. 43, ¶ 91). Myers testified that Helwig suggested she "retire" from Misericordia and requested two weeks off to consider the characterization of her departure. (Doc. 43, ¶ 92). Helwig denies that Myers informed her of his plan to terminate her and denies suggesting retiring from Misericordia. (Doc. 58, ¶ 91). Helwig also denies that her two-week leave was to consider the characterization of her departure, asserting that her sick leave was to "think and for her to receive medical treatment." (Doc. 58, ¶ 93). At 3:30 p.m. on February 16, 2022, following the meeting with Myers, Helwig sent Parsnik an email stating in relevant part,

> It didn't go well. In my view, he is looking for a reason. He said the board told him to evaluate all his administrators and that he could have asked for our resignations on Day 1. He asked me if I was going to resign. I told him I was planning on retiring from the place. He asked me when that would be (which I know is illegal). I said I don't know. He is saying he doesn't trust me because I emailed Debbie. I told him I have always directly talked to the board. **I asked**

**him for two weeks sick leave as a reprieve for both of us to think.** Plus I have been trying to find a period to get this treatment for skin cancer (I am only sharing that with you) that must be done every day for two weeks. I called yesterday and they said I could start tomorrow. . .

(Doc. 43, ¶ 95; Doc. 58, ¶ 95).

It is undisputed that Helwig did not inform Myers that she had any health issues prior to February 16, 2022. (Doc. 43, ¶ 96; Doc. 58, ¶ 96). However, Myers contends that he was not informed of or aware of any disability or medical condition Helwig may have had on February 16, 2022. (Doc. 43, ¶ 97). While Helwig asserts, unsupported by the record, that she advised Myers during their February 16, 2022 meeting, that she had a medical condition that needed treatment requiring up to four weeks off. (Doc. 58, ¶ 97).

On February 17, 2022, Myers approved Helwig's time off request for two weeks and set a meeting for February 28, 2022, following Helwig's requested return date of February 25, 2022. (Doc. 43, ¶ 104). During Helwig's two week leave, Myers prepared for Helwig's departure by requesting that Parsnik and Mark Van Etten ("Van Etten"), Vice President of Finance and Administration at Misericordia, prepare a proposed separation agreement for Helwig. (Doc. 43, ¶ 106). Helwig does not controvert this fact but adds that by February 28, 2022, Myers did not know if he would execute the separation agreement. (Doc. 58, ¶ 106). On February 23, 2022, Myers emailed Van Etten and Parsnik stating in relevant part, "I have a meeting scheduled with Sue on Monday at Noon. I will need to have a proposed separation agreement by then. I do not yet know if we will execute it, but we need to be prepared." (Doc. 43, ¶ 109; Doc. 58, ¶ 109).

On February 28, 2022, Myers first contacted Dr. Tanya Easton ("Easton"), a woman born in 1957, who was later hired as the interim and then permanent Vice President for University Advancement. (Doc. 43, ¶ 110, 164). Helwig denies this fact, asserting that Myers'

first contact with Easton was on March 2, 2022, with the message, "Sorry for the slow reply. I'd love to talk soon…" (Doc. 58, ¶ 110). Myers testified that he also met with Helwig on February 28, 2022, in which he reaffirmed his decision to terminate Helwig and asked for her input on how she wished to portray her departure. (Doc. 43, ¶ 112). Helwig denies this fact, asserting that Myers notified Van Etten and Parsnik of his decision to terminate Helwig on March 2, 2022, and advised Helwig that she was going to be terminated on March 3, 2022. (Doc. 43, ¶ 112). The meeting on February 28, 2022, lasted only thirty minutes because Myers had another meeting to attend, so Myers requested a follow up meeting with Helwig for the following day. (Doc. 43, ¶ 115; Doc. 58, ¶ 115). Helwig took sick days on March 1 and March 2, 2022, and proposed reconvening March 3, 2022, which Myers agreed to. (Doc. 43, ¶ 118; Doc. 58, ¶ 118).

On March 1, 2022, Helwig sent the following message to Pellegrini,

He is going to let me go, Larry. He doesn't trust me because of the email to Debbie. He also didn't like that I didn't take the staff shortage stuff out of my board report after he agreed that we needed more staff, and that I brought back up the banners for the corporate sponsorship program after it was decided it wouldn't be done. Those were his examples.

(Doc. 43, ¶ 120; Doc. 58, ¶ 120).

On March 1, 2022, Helwig also sent an email to Myers, edited by Pellegrini, to demonstrate her commitment to Misericordia. (Doc. 43, ¶ 121; Doc. 58, ¶ 121). Helwig testified that she wrote the email with Pellegrini because they "had heard that [Myers] was interviewing other people for [her] job." (Doc. 43, ¶ 122; Doc. 58, ¶ 122).

On March 3, 2022, Helwig submitted a return to work note from her doctor dated March 2, 2022, that read, "Please allow Susan to come to the office to work as required but work remotely as needed. She may also need to take time off as needed for a healing surgical

site on the left leg." (Doc. 43, ¶ 126; Doc. 58, ¶ 126). Remote work was available to Helwig as a matter of course, and all her requests for sick days were granted. (Doc. 43, ¶ 128-29; Doc. 58, ¶ 128). Helwig notes that she was unable to take certain sick days or FMLA leave because she was "abruptly terminated" by Myers. (Doc. 58, ¶ 129). Also on March 3, 2022, Myers and Helwig met again, and Myers presented Helwig with a proposed Resignation and General Release Agreement. (Doc. 43, ¶ 130; Doc. 58, ¶ 130). It is undisputed that Myers invited Helwig's negotiation with respect to the proposed agreement; however, Helwig denies that Myers asked her how she wanted her departure phrased to the community. (Doc. 43, ¶ 133-35; Doc. 58, ¶ 133-35).

On March 4, 2022, Myers' Chief of Staff, James Roberts sent Myers a first draft of the announcement of Helwig's departure. (Doc. 43, ¶ 137). Helwig notes that the draft was a "first draft of a possible announcement." (Doc. 58, ¶ 137). Also on March 4, Myers first met with Easton via Zoom to discuss the interim Vice President of University Advancement position. (Doc. 43, ¶ 138; Doc. 58, ¶ 138). Later that day, Helwig emailed Myers requesting that the follow-up meeting be postponed until she can confer with her lawyer. (Doc. 43, ¶ 139; Doc. 58, ¶ 139). Myers scheduled the follow up meeting for March 8, at 11:00 a.m. (Doc. 43, ¶ 140; Doc. 58, ¶ 140).

In the interim, on March 7, 2022, Myers coordinated the logistics of offering Easton the interim Vice President of University Advancement role. (Doc. 43, ¶ 141). Helwig notes that it was unusual that by March 7, Human Resources did not have an application or resume from Easton. (Doc. 58, ¶ 141). On the same day, Helwig submitted a request to complete FMLA paperwork to Dr. Cassondra Ellison. (Doc. 43, ¶ 142; Doc. 58, ¶ 142). On March 8, 2022, Helwig sent an additional request to complete FMLA paperwork to Dr. Karl Luxardo,

who scheduled an appointment for March 10, 2022. (Doc. 43, ¶ 143, 145; Doc. 58, ¶ 143, 145). On March 8, 2022, Helwig also emailed Myers that she needed to take a sick day, indicating continued medical complications and further delaying their follow-up meeting. (Doc. 43, ¶ 144; Doc 58, ¶ 144). In response, Myers requested Helwig call him that day for some information. (Doc. 43, ¶ 146; Doc. 58, ¶ 146). Rather than calling, Helwig emailed Myers to following day, indicating that she needed additional sick days for March 9 and March 10 and would provide a doctor's note after meeting with her doctor on March 10. (Doc. 43, ¶ 147; Doc. 58, ¶ 147). Myers replied via email on March 9, 2022, stating in relevant part,

> The information I need is whether or not, as you suggested in our most recent meeting, you are going to "retire." I need to know if that is how you would like your departure understood because **I am going to make an announcement tomorrow** and I need to know whether or not to say you are "retiring."
> As for the provisions you mention below [in Plaintiff's previous email], I await your counterproposal, as I said in our meeting.

(Doc. 43, ¶ 148, Doc. 58, ¶ 148).

Helwig notes that she never suggested retirement. (Doc. 58, ¶ 148).

Before responding to Myers, Helwig sent an email to Parsnik, advising her of Helwig's intent to submit paperwork for FMLA leave. (Doc. 43, ¶ 149; Doc. 58, ¶ 149). Then Helwig responded to Myers, informing him that an announcement of her retirement would be premature, and that she retained counsel relative to the separation agreement Myers presented her on March 3, 2022. (Doc. 43, ¶ 151; Doc. 58, ¶ 151). Myers replied to Helwig and her counsel, informing them that Helwig is an at-will employee who is terminated effective March 9, 2022, that Myers will announce Helwig's departure on March 10, 2022, and that he looks forward to their counter proposal regarding the separation agreement. (Doc. 43, ¶ 154; Doc. 58, ¶ 154). Defendants contend Helwig never provided a counterproposal; however, Helwig asserts that she sent a counter proposal on March 22, 2022, to counsel for Misericordia. (Doc.

43, ¶ 155; Doc. 58, ¶ 155). Helwig testified that her last effective date of employment was March 9, 2022. (Doc. 43, ¶ 157; Doc. 58, ¶ 157).

In the evening of March 9, 2022, Myers sent the announcement of Helwig's departure to the Executive Committee of the Board, and the communication cascade to other members of Misericordia continued into the morning of March 10, 2022. (Doc. 43, ¶ 156; Doc. 58, ¶ 156). On March 10, 2022, at 5:16 p.m., Helwig submitted FMLA paperwork to Misericordia's Human Resources department via facsimile, which were filled out by Helwig on March 8 and completed by her physician on March 10. (Doc. 43, ¶ 158-59; Doc. 58, ¶ 158-59).

Helwig filed a complaint on December 12, 2022, alleging eight counts under state and federal law. (Doc. 1). Count I alleges Defendants violated the Americans with Disabilities Act ("ADA") by discriminating, harassing, and creating a hostile work environment against Helwig on the basis of her disability. (Doc. 1, ¶¶ 12-88). Count II alleges that Defendants violated Title VII of the Civil Rights Act ("Title VII") by terminating Helwig because of her gender. (Doc. 1, ¶¶ 89-99). Count III alleges Defendants violated the Age Discrimination and Employment Act ("ADEA") by terminating Helwig because of her age. (Doc. 1, ¶¶ 100-07). Count IV alleges Defendants violated the Family Medical Leave Act ("FMLA") by terminating Helwig while she was in the process of submitting FMLA paperwork. (Doc. 1, ¶¶ 108-23). Count V alleges that Defendants created a hostile work environment by subjecting Helwig to harassment based upon her disability and gender. (Doc. 1, ¶¶ 124-28). Count VI alleges Defendants violated the Pennsylvania Human Relations Act ("PHRA") by discriminating against Helwig based on her disabilities, age, and gender. (Doc. 1, ¶¶ 129-36). Count VII alleges retaliation under the ADA, ADEA, PHRA, and FMLA by terminating Helwig due to her taking intermittent time off for medical appointments and needing

additional leave due to her medical condition. (Doc. 1, ¶¶ 137-46). Count VIII alleges defamation based on Myers' false statement that Helwig was "terminated effectively immediately," which insinuates from Misericordia's policies that Helwig committed significant wrongdoing, such as fraud, theft, or misappropriation of funds. (Doc. 1, ¶¶ 147-58).

On May 16, 2025, Defendants filed a motion for summary judgment along with corresponding exhibits, a statement of facts, and a brief in support. (Doc. 42; Doc. 43; Doc. 44). On June 23, 2025, Helwig filed a brief in opposition, a response to statement of facts, and corresponding exhibits. (Doc. 57; Doc. 58). On July 11, 2025, Defendants filed a reply brief. (Doc. 62).

## II.    MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed

by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. *Fed. R. Civ. P. 56(c)*; *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony. . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").

## III.  DISCUSSION

Defendants move for summary judgment on six bases. First, Defendants aver that the Court should grant summary judgment on all claims against Myers individually, asserting that an individual cannot be held liable on federal discrimination or defamation claims as a matter of law. (Doc. 44, at 6, 8-9).[2] Defendants then posit that the Court should grant summary judgment on Helwig's federal discrimination claims against Misericordia because Helwig fails to present a prima facie case of age, gender, or disability discrimination under the ADEA, Title VII, and ADA respectively. (Doc. 44, at 10, 14). Defendants next argue that the Court should grant summary judgment on Helwig's retaliation claims because Helwig fails to present a prima facie case of retaliation under the ADA, ADEA, PHRA, and FMLA

---

[2] The Court **GRANTS** Defendants' motion for summary judgment on Counts I, II, and III against Myers because Helwig agrees to withdraw those claims. (Doc. 57, at 12). Regarding Helwig's defamation claims against Myers, the Court finds that Helwig may state a defamation claim against Myers individually because he is not a high public official. *See Paparo v. Borough of Yeadon*, 714 F. Supp. 3d 529, 559 (E.D. Pa. 2024) (finding Pennsylvania law only protects individual defendants from tort liability if they are a high public official whose actionable behavior was made in the course of their official duties); *see also Aldorasi v. Crossroads Hospitality and Management Co., LLC*, 344 F. Supp. 3d 814, 822 (E.D. Pa. 2018) (finding that under Pennsylvania law, an individual is not relieved of liability when a corporation is vicariously or secondarily liable under the doctrine of respondeat superior). However, as discussed in Section H *supra*, the Court finds that Defendants are entitled to summary judgment on Helwig's defamation claims.

nor can they show that the Defendants proffered reason's for Helwig's termination are pretextual. (Doc. 44, at 19, 22). Defendants then aver that the Court should grant summary judgment on Helwig's claims of harassment and hostile work environment because she fails to present a prima facie case of harassment and hostile work environment under Title VII and the ADA. (Doc. 44, at 27, 29). Defendants also contend that this Court should grant summary judgment on Helwig's claim for FMLA failure to notify because Helwig did not request FMLA leave until after her discharge was recommended by Myers. (Doc. 44, at 30-31). Finally, Defendants move for summary judgment on Helwig's defamation claim under Pennsylvania law because Helwig fails to present a prima facie case of defamation under Pennsylvania law, and Defendants have the absolute defense of truth against the defamation claim. (Doc. 44, at 33-34).

A. SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S GENDER DISCRIMINATION CLAIMS.

In Counts II and VI, Helwig alleges claims of gender discrimination under Title VII and the PHRA against Misericordia. (Doc 1, ¶¶ 89-99, 129-36).[3] Defendants assert that Helwig cannot show age or gender discrimination because she was replaced by Easton, a "highly qualified woman who is slightly older than [Helwig]." (Doc. 44, at 16). Helwig avers that there was a double standard in treatment between male and female employees at Misericordia. (Doc. 57, at 28-30). Helwig asserts that there was a well-known "Old Boys' Club" at Misericordia that permitted younger, male employees to communicate directly with

---

[3] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Because Title VII is coextensive to the PHRA, the Court will address the merits of Helwig's PHRA discrimination claims under Title VII. *Kelly*, 94 F.3d at 105; *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164, 171 (E.D. Pa. 2023).

the board and meet regularly with Myers. (Doc. 57, at 29-30). Helwig further avers that she never received a vote of no confidence in her 22 years of employment, when male vice presidents have. (Doc. 57, at 31).

Title VII discrimination claims are analyzed through the *McDonnell Douglas* burden shifting standard under which Helwig must first establish a *prima facie* case of discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).[4] If the plaintiff meets her initial burden to establish a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Jones*, 198 F.3d at 410. If the employer satisfies this second step, the burden returns to the plaintiff to show "by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Jones*, 198 F.3d at 410.

### a. Helwig Establishes a Prima Facie Case of Gender Discrimination.

To establish a prima facie case of Title VII discrimination, a plaintiff must generally demonstrate that "(1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered from some form of adverse employment action; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination."

---

[4] This standard was first established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, in which the Court held that when analyzing discriminatory hiring claims, courts first must consider whether a plaintiff has established a *prima facie* case that an employer's decision not to hire them was discriminatory. 411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701 (1993). The Court further found that once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to propose a non-discriminatory reason for its decision not to hire the plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 802-03. The Court concluded that if the employer establishes a non-discriminatory reason for not hiring the plaintiff, the burden shifts back to the plaintiff to establish that the employer's proposed non-discriminatory reason is pretextual or "discriminatory in its application." *McDonnell Douglas Corp.*, 411 U.S. at 807.

*Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 494 (M.D. Pa. 2015) (citing *Jones*, 198 F.3d at 410-11). The analysis centers around whether the employer treats "some people less favorably than others because of their race, color, religion, sex, or national origin." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). A plaintiff must also show some "causal nexus between [her] membership in a protected class and the [adverse] decision." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 789 (3d Cir. 2003). Therefore, to show sex discrimination under Title VII, a plaintiff must show that her gender was a "determinative factor" in the adverse employment action. *Kimes*, 126 F.3d at 494 (citing *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir. 2000)). An inference of unlawful discrimination can arise when a similarly situated colleague outside of the plaintiff's protected class receives more favorable treatment from an employer. *Peake v. Pennsylvania State Police*, 644 F. App'x 148, 151 (3d Cir. 2016) (nonprecedential); *McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 WL 355617, at *10-*12 (E.D. Pa. Feb. 6, 2008); *see also Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024). Employees are similarly situated when they have similar responsibilities and are held to similar standards. *Oakley v. Orthopaedic Associates of Allentown, Ltd.*, 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010).

The parties agree that Helwig is a woman whose termination was an adverse employment action. (Doc. 43, ¶¶ 1, 154; Doc. 58, ¶¶ 1, 154). Accordingly, the parties do not dispute that Helwig meets the first and third elements of a prima facie case of employment discrimination. *See Scheidemantle v. Slippery Rock Univ. State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (finding gender is a protected class under Title VII); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (finding significant change in employment status such as termination constitutes an adverse employment action). It is also undisputed that Helwig held her position at Misericordia for twenty-two years, and thus, she was qualified

for the position. (Doc. 43, ¶¶ 9, 107; Doc. 58, ¶¶ 9, 107); *see Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home*, No. 13-2463, 2014 WL 2921534, at *3 (E.D. Pa. June 27, 2014) (citing *Chapman v. Am. Inst. of Certified Pub. Accts.*, 233 F. App'x 141, 143 (3d Cir. 2007)) ("An extended period of employment in a particular position gives rise to an inference that a plaintiff was objectively qualified for that position.").

Regarding the fourth element of a prima facie case, those actions giving rise to an inference of unlawful discrimination, Helwig satisfies this prong by showing that similarly situated colleagues outside her protected class received more favorable treatment. *See Peake*, 644 F. App'x at 151; *see also McCormick*, 2008 WL 355617, at *10-*12. Helwig points to evidence in the record that Van Etten, the Vice President of Finance and David Rehm ("Rehm"), Vice President of Academic Affairs, were permitted to communicate directly with the board and have regular meetings with Myers. (Doc. 43-2, at 32; Doc. 43-5, at 24-25; Doc. 57, at 28-29). Myers testified that Van Etten was not disciplined or terminated when he included material in Board Reports that Myers had not approved, when the same action is one of the series of events that Defendants assert led to Helwig's termination. (Doc. 43-2, at 32; Doc. 57, at 29; Doc. 43, ¶¶ 51-58). Van Etten testified that, even though he and Rehm are at the same level as Helwig, Myers sought out Van Etten and Rehm for university-wide information unrelated to their roles at Miseriocordia. (Doc. 43-5, at 24-25; Doc. 57, at 28-29). Van Etten also testified that both he and Helwig were considered difficult to work with at Misericordia. (Doc. 43-5, at 24; Doc. 57, at 28). Rehm and Van Etten are both Vice Presidents of Misericordia departments who report to Myers, so they are at the similarly situated to Helwig. *See Oakley*, 742 F. Supp. 2d at 608. Accordingly, Helwig has pointed evidence of similarly situated employees receiving more favorable treatment giving rise to an inference of

unlawful discrimination as to make a prima facie case of gender discrimination. *See Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (finding an inference of discrimination where plaintiff was fired for poor performance, while their colleague with the same position, supervisor, and performance reviews was promoted).

      **b. Defendants Provide a Legitimate, Nondiscriminatory Reason for Helwig's Termination.**

      As Helwig has met her initial burden establishing a prima facie case of gender discrimination, the burden shifts to Misericordia to offer a legitimate, non-discriminatory reason for the adverse employment action. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999). "[T]he defendant's burden at this stage is relatively light and . . . it is satisfied if the defendant articulates a legitimate reason for the adverse employment action." *Johnson v. Keebler-Sunshine Biscuits*, Inc., 214 F. App'x 239, 242 (3d Cir. 2007) (examining *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n. 2 (3d Cir. 1997)).

      Defendants submit that the parties do not dispute that Helwig was an at-will employee and that Smith-Mileski found Helwig's February 7th email to be "jabbing" and "punitive." (Doc. 43, ¶¶ 67, 71-72; Doc. 58, ¶ 67, 71-72; Doc. 44, at 26-27; Doc. 62, at 15-17). Misericordia also avers that the parties do not dispute that Myers' executive coach suggested deciding next steps because, with the February 7th email, Helwig had "absolutely broken trust" with Myers. (Doc. 43, ¶ 79; Doc. 58, ¶ 79; Doc. 44, at 29; Doc. 62, at 32-33). While Helwig, Van Etten, and Rehm are similarly situated employees, Misericordia has offered that Helwig's termination was not only based on the series of incidents with Myers, but also because of Helwig's "drawing a line in the sand" in sending an inappropriate email to the Chair of the Board of Trustee's, which her similarly situated colleagues did not do. (Doc. 45, ¶ 65; Doc. 58, ¶ 65; Doc. 44, at 26-27; Doc. 62, at 32-33).

   c. **Helwig Fails to Present Evidence that Defendants' Legitimate, Non-Discriminatory Reasons for Her Termination Are Pretext**.

As Misericordia demonstrated a legitimate, non-discriminatory reason for the termination, the burden returns to Helwig to show by a preponderance of the evidence that Defendants' proffered nondiscriminatory reason is pretextual. *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 654 (3d Cir. 2015) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)). A plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted); *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Providing evidence of positive performance reviews is insufficient to show that the proffered non-discriminatory reason for the adverse employment action was pretext. *Trapani v. Greatwide Logistics Servs., LLC*, 487 Fed. Appx. 21, 24-25 (3d Cir. 2012).

Helwig contends that Defendants' assertion that she had a poor performance and was not trustworthy is not credible because Helwig has twenty-two years of favorable performance reviews, and she recently completed a campaign that exceeded fundraising goals. (Doc. 57, at 42-43). To show pretext, Helwig points to the same evidence she used to show prima facie discrimination, that Van Etten was similarly situated to Helwig but received superior treatment. (Doc. 43-2, at 32; Doc. 43-5, at 24-25; Doc. 57, at 30). Helwig also offers that in her twenty-two years of employment, she never received a vote of no confidence, when two other male Vice Presidents received votes of no confidence by faculty and continue to be employed. (Doc. 43-5, at 35-36; Doc. 57 at 30-31). Defendants counter that the Vice Presidents who received votes of no confidence were in academic positions, and Helwig was

never subject to a faculty confidence vote because her role was unrelated to faculty. (Doc. 43-2, at 37; Doc. 43-5, at 18, 36; Doc. 43-6, at 23-24; Doc. 62 at 19 n. 14). Regardless of whether Helwig was subject to a faculty confidence vote, evidence of positive performance reviews is insufficient to show pretext. *Trapani*, 487 Fed. Appx. 21, 24-25 (3d Cir. 2012). Therefore, viewing the record in the light most favorable to Helwig, there is no genuine dispute of material fact as to whether Misericordia's proffered reasons for terminating Helwig are pretextual. Accordingly, Defendants' motion for summary judgment on Helwig's claims of sex discrimination in Counts II and VI against Defendants is **GRANTED**. (Doc. 42).

B. SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S AGE DISCRIMINATION CLAIMS.

In Counts III and VI, Helwig alleges claims of age discrimination under the ADEA and PHRA against Misericordia. (Doc. 1, ¶¶ 100-07, 129-36).[5] Defendants assert that Helwig cannot show age or gender discrimination because she was replaced by Easton, a "highly qualified woman who is slightly older than [Helwig]." (Doc. 44, at 16). Helwig counters that Myers sought to replace her with an individual who is "of a younger mindset and more in-line with his style." (Doc. 57, at 21). Helwig also asserts that Myers was unaware of the age of Easton when hiring her as the interim Vice President of University Advancement. (Doc. 57, at 21).

A plaintiff must first establish a prima facie case of discrimination under the ADA to survive summary judgment. *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d

---

[5] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Because the ADEA is coextensive to the PHRA, the Court will address the merits of Helwig's PHRA discrimination claims under the ADEA. *Kelly*, 94 F.3d at 105; *Colwell v. RiteAid Corp.*, 602 F.3d 495, 500 n.3 (3d Cir. 2010).

Cir. 2015). To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that "(1) [she] is at least 40 years old; (2) [she] suffered an adverse employment decision; (3) [she] was qualified for the position in question; and (4) [she] was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis*, 808 F.3d at 644. A discriminatory inference cannot be drawn under the ADEA when one worker is replaced with an insignificantly younger worker. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *see Willis*, 808 F.3d at 644 (requiring plaintiff to show she was "ultimately replaced by another employee who was sufficiently younger so as to support an inference of discriminatory motive"). If the plaintiff successfully establishes a prima facie case creating an inference of discrimination, the burden shifts to the employer who must "articulate a legitimate nondiscriminatory reason for the adverse action." *Willis*, 808 F.3d at 644 (quoting *Jones*, 198 F.3d at 412). If the employer satisfies this second step, the burden shifts back to the plaintiff to show "by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Willis*, 808 F.3d at 644-45 (3d Cir. 2015) (citing *Burton*, 707 F.3d at 426).

It is undisputed that Helwig is over 40 years old and that she suffered an adverse employment decision. (Doc. 43, ¶¶ 1, 154; Doc. 58, ¶¶ 1, 154); *see Burlington Indus., Inc.*, 524 U.S. at 761 (finding significant change in employment status such as termination constitutes an adverse employment action). It is also undisputed that Helwig held her position at Misericordia for twenty-two years, and thus, she was qualified for the position. (Doc. 43, ¶¶ 9, 107; Doc. 58, ¶¶ 9, 107); *see Barthold*, 2014 WL 2921534, at *3 (citing *Chapman*, 233 F. App'x at 143) ("An extended period of employment in a particular position gives rise to an inference that a plaintiff was objectively qualified for that position."). However, Helwig

cannot establish a prima facie case of age discrimination because it is undisputed that she was ultimately replaced by Easton, who is older than Helwig. (Doc. 43, ¶¶ 1, 163; Doc. 58, ¶¶ 1, 163); *O'Connor*, 517 U.S. at 313 (holding a discriminatory inference cannot be drawn under the ADEA when one worker is replaced with an insignificantly younger worker); *Willis*, 808 F.3d at 644 (finding same). Therefore, with all evidence construed on favor of Helwig, a reasonable jury could not find that Helwig was terminated because of her age. Accordingly, Defendants' motion for summary judgment on Helwig's claims of age discrimination in Counts III and VI against Defendants is **GRANTED**. (Doc. 42).

### C. SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S DISABILITY DISCRIMINATION CLAIMS.

In Count I, Helwig alleges disability discrimination and harassment based on her disability resulting in a hostile work environment. (Doc. 1, ¶¶ 12-88). In Count VI, Helwig alleges disability discrimination under the PHRA. (Doc. 1, ¶¶ 12-88, 129-36).[6] Defendants argue that Helwig is not disabled within the meaning of the ADA because the record fails to demonstrate any evidence that Helwig suffered any limits on her major life activities. (Doc. 44, at 17-18). Helwig counters that she is a member of a protected class because she suffered from cancer and underwent cancer treatment at all relevant times, which impacted her daily life activities, such as her ability to work. (Doc. 57, at 32).

To survive summary judgment on the ADA discrimination claim, Helwig must first establish a prima facie case by showing that "(1) [she] is a disabled person within the meaning

---

[6] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Because the ADA is coextensive to the PHRA, the Court will address the merits of Helwig's PHRA discrimination claims under the ADA. *Kelly*, 94 F.3d at 105; *Abadi v. Target Corp.*, No. 23-1050, 2023 WL 4045373, at *3 (3d Cir. June 16, 2023).

of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998); *Turner v. Hershey Chocolate U.S.A.*, 440 F.3d 604, 611 (3d Cir. 2006); *see also Woods v. AstraZeneca Pharm.*, L.P., 659 F. Supp. 3d 512, 544 (M.D. Pa. 2023) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) (stating a prima facie case of hostile work environment under the ADA requires plaintiff to show she is a qualified individual with a disability under the ADA). The parties dispute whether Helwig has made a showing that she is disabled within the meaning of the ADA. (Doc. 44, at 18-20; Doc. 57, at 32).

To meet the definition of disabled under the ADA, a plaintiff must have "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) [be] regarded as having such an impairment." *Alston v. Park Pleasant, Inc.,* 679 F. App'x 169, 171 (3d Cir. 2017) (nonprecedential) (quoting 42 U.S.C. § 12102(1)). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(a). The operation of normal bodily functions, such as a functioning immune system and normal cell growth, also constitute major life activities under the ADA Amendments Act of 2008 ("ADAAA"). *Alston*, 679 F. App'x at 171-72 (citing 42 U.S.C. § 12102(2)(B)).

However, to show a genuine dispute of material fact regarding whether a medical diagnosis limits a major life activity, a plaintiff must perform an individualized assessment,

evidencing specific facts as to why plaintiff's disability substantially limits a major life activity, even when the limitation seems self-explanatory. *Alston,* 679 F. App'x at 172 (citing *Albertson's Inc. v. Kirkinburg*, 527 U.S. 555, 566 (1999)). Even though cancer will qualify as a disabling disability in most cases, an individual assessment is nevertheless necessary to determine whether an impairment substantially limits a major life activity or body function. *Alston*, 679 F. App'x at 172; 29 C.F.R. § 1630.2(j)(1)(iv). It is insufficient to merely state that cancer qualifies as a disability. *See Alston*, 679 F. App'x at 172; *see also Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 567 (1999) (holding that while individuals with monocular vision easily meet the ADA's definition of disability, they nevertheless must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial"); *see also Colwell v. Rite Aid Corp.,* 602 F.3d 495, 501-02 (3d Cir. 2010) (holding same). Additionally, showing a record of cancer diagnosis is insufficient to meet this burden. *See Lloyd v. Washington & Jefferson College*, 288 Fed. Appx. 786, 788 (3d Cir. 2008) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 108 (3d Cir. 1996)) (finding a record of impairment is insufficient to show disability under the ADA without evidence of substantial limitation on a major life activity).

Helwig fails to specify how her melanoma limited one or more of her life activities, only that cancer substantially limits a major life activity "on its face" according to regulations implementing the ADAAA. (Doc. 1, ¶ 15–16; Doc. 57, at 25); 29 C.F.R. § 1630.2(j)(3). When deposed, Helwig failed to articulate a limited major life activity, stating only that the surgery to remove her melanoma left a "big hole" in her leg that she had to keep clean. (Doc. 43-1, at 18-19; Doc. 57, at 25); *see Alston*, 679 Fed. App'x at 172–73 (holding plaintiff failed to show disability under the ADA because she averred she was not substantially limited in any major

life activity at her deposition); *see also Albertson's, Inc.*, 527 U.S. at 567 (holding that while individuals with monocular vision easily meet the ADA's definition of disability, they nevertheless must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial"). Helwig provides medical records from her cancer treatment that specify that her postoperative care consists of cleaning and dressing her wound daily. (Doc. 436-37; Doc. 57, at 25). *See Lloyd*, 288 Fed. Appx. at 788 (citing *Kelly*, 94 F.3d at 108) (finding a record of impairment is insufficient to show disability under the ADA without evidence of substantial limitation on a major life activity). Helwig also provides FMLA paperwork dated March 10, 2022, which states that Helwig had multiple wounds that were healing and that she was unable to focus due to pain. (Doc. 46-34, at 5; Doc. 57 at 25). However, the FMLA paperwork was filled and signed the day after Helwig's last day of employment at Misericordia. (Doc. 46-34, at 5; Doc. 43, at 157; Doc. 58, at 157).

Helwig fails to provide even minimal evidence that her cancer diagnosis substantially limited any major life activity at all times relevant to this litigation. 29 C.F.R. § 1630.2(j)(1)(iv); *see Alston*, 679 Fed. App'x at 172–73; *see Albertson's*, 527 U.S. at 567; *see also Lloyd*, 288 Fed. Appx. at 788 (citations omitted). Therefore, there is no genuine issue of disability discrimination or harassment for trial, and Defendants' motion for summary judgement on Counts I and VI is **GRANTED**. (Doc. 42).

   D.   SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S ADA, ADEA, AND PHRA RETALIATION CLAIMS.

In Count VII, Helwig alleges retaliation under the ADA, ADEA, and PHRA. (Doc. 1, ¶¶ 137-46). [7] Defendants contend that Helwig's termination preceded her alleged protected activity, so she cannot establish a prima facie case of retaliation. (Doc. 44, at 23). Helwig counters that her termination was subsequent to or contemporaneous with Helwig's protected activity, sufficient to establish retaliation. (Doc. 57, at 36).

Retaliation claims are analyzed through the *McDonnell Douglas* burden shifting standard under which Helwig must first establish a *prima facie* case of retaliation. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (stating *McDonnell Douglas* burden shifting standard applies to ADA retaliation claims); *Faslod v. Justice*, 409 F.3d 178, 188-89 (3d Cir. 2005) (stating *McDonnell Douglas* burden shifting standard applies to ADEA and PHRA retaliation claims). If the plaintiff meets their initial burden to establish a prima facie case, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the adverse employment action. *Krouse*, 126 F.3d at 500-01; *Faslod*, 409 F.3d at 188. If the employer meets this minimal burden, the burden shifts back to the plaintiff, who must point to evidence that the employer's legitimate, non-retaliatory reason is pretextual. *Krouse*, 126 F.3d at 500-01; *Faslod*, 409 F.3d at 188.

---

[7] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Because the ADA, ADEA, and PHRA are generally coextensive, the Court will address the merits of Helwig's PHRA retaliation claim under the ADA and ADEA. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999); *Kelly*, 94 F.3d at 105; *Fogleman v. Mercy Hosp., Inc.*, 91 F. Supp. 2d 788, 790-91 (M.D. Pa. 2000), rev'd on other grounds, 283 F.3d 561 (3d Cir. 2002). Additionally, Helwig appears to assert a retaliation claim under Title VII for the first time in her brief in opposition. (Doc. 57). As Helwig did not include a Title VII retaliation claim in her complaint, the Court does not need to consider an additional claim raised for the first time in her briefing. *Holland v. Simon Property Grp., Inc.*, 495 Fed. App'x. 270, 273 n. 4 ("The District Court correctly declined to consider claims of retaliation asserted for the first time in [plaintiff's] summary judgment opposition brief."); *see also Treaster v. Conestoga Wood Specialties Corp.*, No 4:09-CV-632, 2010 WL 2606481, at *3 (M.D. Pa. 2010) (finding same).

To establish a prima facie case of retaliation under the ADA, Helwig must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse.*, 126 F.3d at 500. Under the ADA, protected activity includes requesting sick leave and requesting an accommodation for a disability. *Jones v. Serv. Elec. Cable TV, Inc.*, 809 Fed. Appx. 105, 110 (3d Cir. 2020) (finding sick leave constitutes protected activity under ADA); *Sowell v. Kelly Services, Inc.*, 139 F. Supp. 3d 684, 702 (E.D. Pa. 2015) (finding requests for accommodation are protected activity under the ADA). Unlike discrimination claims, retaliation claims do not require a plaintiff to prove they have a disability, but that they requested an accommodation in good faith. *Barber v. Subway*, 131 F. Supp. 3d 321, 329 (M.D. Pa. 2015). ADA retaliation for requests for accommodation arises when the employer fails to reasonably accommodate the employee. *Barber*, 131 F. Supp. at 330.

Helwig engaged in ADA protected activity by requesting sick leave and accommodations when she returned to work. (Doc. 43-1, at 122, 156; Doc. 43-2, at 12; Doc. 57 at 45); *Jones*, 809 Fed. Appx. at 110; *Sowell*, 139 F. Supp. 3d at 702. The parties agree that Helwig's termination from Misericordia was an adverse employment action. (Doc. 43, ¶ 154; Doc. 58, ¶ 154). However, Helwig cannot show that her sick leave and accommodation requests were causally related to her adverse employment activity because it is undisputed that Defendants approved every one of Helwig's sick leave requests at all relevant times to this litigation, and the parties agree that Helwig was entitled to and not denied her requested accommodation of working from home. (Doc. 43, ¶¶ 128-29; Doc. 58, ¶¶ 128-29); *see Barber*, 131 F. Supp. at 330 (finding retaliation for requests for accommodation for a disability arise

when an employer fails to reasonably accommodate an employee). Accordingly, Helwig fails to show a prima facie case of retaliation under the ADA. Defendants' motion for summary judgement on Helwig's claims of ADA, ADEA, and PHRA retaliation in Count VII is **GRANTED**. (Doc. 42).[8]

### E. SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S FMLA RETALIATION CLAIM.

In Count VII, Helwig also alleges retaliation under the FMLA. (Doc. 1, ¶¶ 137-46). Defendants contend that Helwig's termination preceded her alleged protected activity, so she cannot establish a prima facie case of FMLA retaliation. (Doc. 44, at 23). Helwig counters that her termination was subsequent to or contemporaneous with Helwig's protected activity, sufficient to establish FMLA retaliation. (Doc. 57, at 36).

FMLA retaliation claims are analyzed through the *McDonnell Douglas* burden shifting standard under which Helwig must first establish a *prima facie* case of retaliation. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012). If the plaintiff meets her initial burden to establish a prima facie case, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the adverse employment action. *Lichtenstein*, 691 F.3d at 302. If the employer meets this minimal burden, the burden shifts back to the plaintiff, who must point to evidence that the employer's legitimate, non-retaliatory reason is pretextual. *Lichtenstein*, 691 F.3d at 302.

### a. Helwig Establishes a Prima Facie Case of FMLA Retaliation.

---

[8] Helwig also fails to show an exercise of protected activity under the ADEA. The record shows no evidence that Helwig made any complaints related to age discrimination at Misericordia. Nor does Helwig provide any evidence that she engaged in protected activity under the ADEA. (Doc. 57, at 35-37). Therefore, Helwig fails to show a prima facie case of retaliation under the ADEA.

To establish a prima facie case of retaliation under the FMLA, Helwig must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein*, 691 F.3d at 301-02. To invoke a right to FMLA-qualifying leave, "employees must provide adequate notice to their employer about their need to take leave." *Lichtenstein*, 691 F.3d at 303 (citing 29 U.S.C. § 2612(e)(2)). As discussed fully in Section F supra, notice to an employer arises either when an employee requests FMLA leave or "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." 29 C.F.R. § 825.300(b)(1); *Lichtenstein*, 691 F.3d at 303-04 ("The [FMLA] regulations clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies."). To establish causation, temporal proximity between the protected activity and the termination is sufficient to establish a causal link between invoking a right under the FMLA and an adverse employment decision. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014). Evidence that an employee was terminated within a week of engaging in protected FMLA activity is sufficient to establish causation. *See Lichtenstein*, 691 F.3d at 307 (noting that an employee being "terminated. . . just seven days after she invoked her right to FMLA leave" establishes causation).

Helwig shows that she engaged in protected activity under the FMLA by notifying Parsnik of her intention to take FMLA leave. (Doc. 43-6, at 116, Doc. 57, at 36-37); *Lichtenstein*, 691 F.3d at 301-02 (finding notice to an employer about taking leave constitutes protected activity for FMLA retaliation). Helwig may also have been engaged in protected activity under the FMLA when she submitted her doctor's note upon return from sick leave,

which disclosed information about Helwig's leg operation. (Doc. 43-1, at 122); *see Lichtenstein,* 691 F.3d at 303-04 (quoting 29 C.F.R. § 825.303(a)) ("where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee. . . to ascertain whether leave is potentially FMLA-qualifying"). The parties dispute whether Helwig was terminated before or after engaging in such FMLA protected activity. (Doc. 43, ¶ 82; Doc. 58, ¶ 82). The parties also dispute whether Helwig's termination was causally related to her intention to apply for FMLA leave. (Doc. 44, at 22-23; Doc. 57, at 26-37).

The parties agree that by March 9, 2022, Helwig already had notice of her termination. (Doc. 43, ¶¶ 130-32; Doc. 58, ¶¶ 130-32; Doc. 43-1, at 29; Doc. 43-2, at 56-57; Doc. 46-17, at 4-9). Therefore, Helwig's notice to Parsnik that she was planning to submit paperwork for FMLA leave occurred after Helwig suffered adverse employment action. *See Alkins v. Boeing,* 826 Fed. Appx. 172, 174-75 (3d Cir. 2020) (nonprecedential) (finding a third-party administrator's decision to award plaintiff leave after he had already been fired in no way reflects a decision by the employer to retaliate against plaintiff for requesting leave). However, there is dispute of fact as to whether Myers decided to terminate Helwig before she took a two-week sick leave from February 16th to 28th and returned with a doctor's note indicating that she had a procedure done on her leg. (Doc. 43-1, at 55, 122, 162-63).

Myers testified that he made the decision to terminate Helwig around February 15, 2022, and he informed Helwig that he intended to terminate her employment during their February 16, 2022 meeting before she went on leave. (Doc. 43-2, at 51-52). Helwig contends that Myers did not notify her of his intent to terminate her until he gave Helwig a proposed Resignation and General Release Agreement on March 3, 2022, after she submitted the

doctor's note that disclosed her leg operation. (Doc. 43-1, at 29, 122; Doc. 43-2, at 56-57; Doc. 46-17, at 4-9, Doc. 58, ¶ 81). Taking inferences in favor of Helwig, providing Helwig with termination notice on the same day she submitted a doctor's note putting Misericordia on notice of Helwig's potential need for FMLA leave creates an inference of causal connection between the employee's protected activity and the employer's adverse action. *See Woodson*, 109, F.3d at 920 ("temporal proximity between the protected activity and the termination is sufficient to establish a causal link"); *see also Lichtenstein*, 691 F.3d 294, 307 (finding that evidence that an employer terminated an employee within a week of her requesting FMLA established a causative link). Accordingly, Helwig demonstrates dispute of facts which could lead a reasonable jury to find prima facie FMLA retaliation.

### b. Defendants Provide a Legitimate, Non-Discriminatory Reason for Helwig's Termination.

With Helwig's showing of prima facie retaliation under the FMLA, the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for the adverse employment action. *Lichtenstein*, 691 F.3d at 302. "[T]he defendant's burden at this stage is relatively light and . . . it is satisfied if the defendant articulates a legitimate reason for the adverse employment action." *Johnson v. Keebler-Sunshine Biscuits*, Inc., 214 F. App'x 239, 242 (3d Cir. 2007) (examining *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n. 2 (3d Cir. 1997). Defendants contend that Plaintiff was not fired for giving notice that she may need FMLA leave but for a series of incidents which culminated in the February 7th email to Smith-Mileski. (Doc. 43-1, at 147; Doc. 43, ¶¶ 42-55; Doc. 58, ¶¶ 42-55; Doc. 44, at 26-27). Defendants argue that Helwig knew the nondiscriminatory reasons she was let go, providing Helwig's March 1, 2022, correspondence Pellini, in which Helwig cites sending the February 7th email to Smith-Mileski, failing to remove the staff shortage from the board report, and bringing the corporate

sponsorship banners back up as reasons why Myers was planning to let her go. (Doc. 43-7, at 33, 56-57). Defendants also provide that it is undisputed that Helwig was an at-will employee subject to termination "for lawful reasons at any time, with or without cause, and with or without notice. (Doc. 43, ¶ 131; Doc. 58, ¶ 131).

### c. Helwig Fails to Present Evidence that Defendants' Legitimate, Non-Discriminatory Reasons for Her Termination Are Pretext.

As Defendants demonstrated a legitimate, non-discriminatory reason for the termination, the burden shifts back to the Helwig to show by a preponderance of the evidence, that Defendants' proffered legitimate, nondiscriminatory reason is pretextual. *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 654 (3d Cir. 2015) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). A plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted); *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Providing evidence of positive performance reviews is insufficient to show that the proffered non-discriminatory reason for the adverse employment action was pretext. *Trapani v. Greatwide Logistics Services, LLC*, 487 Fed. Appx. 21, 24-25 (3d Cir. 2012)

To show that Defendants' offered reason for the adverse employment action was pretextual, Helwig provides that Defendants' assertion that she had a poor performance and was not trustworthy is not credible because Helwig has twenty-two years of favorable performance reviews, and she recently completed a campaign that exceeded fundraising goals. (Doc. 57, at 42-43). Like with her sex discrimination claim, Section A supra, Helwig does not

provide any evidence that Myers' mistrust in her based on her email to the Chair of the Board of Trustees was pretextual for FMLA retaliation. (Doc. 57, at 35-37). Helwig only provides, without citation to the record, that Defendants' decision to terminate Helwig within twenty-four hours of advising that she sought FMLA leave was "highly suspicious." (Doc. 57, at 36). However, the record reflects that it is undisputed that Helwig was informed of her last day of employment before she first notified Parsnik of her intent to take FMLA leave. (Doc. 43, ¶ 148, 149; Doc. 58, ¶¶ 148-49). Therefore, viewing the record in the light most favorable to Helwig, there is no genuine dispute of material fact as to whether Defendants' proffered reasons for terminating Helwig are pretextual. *See Trapani*, 487 Fed. Appx. 21, 24-25 (3d Cir. 2012) (finding evidence of positive performance reviews insufficient to show pretext); *see also Alkins v. Boeing*, 826 Fed. Appx. 172, 174-75 (3d Cir. 2020) (nonprecedential) (finding a third-party administrator's decision to award plaintiff leave after he had already been fired in no way reflects a decision by the employer to retaliate against plaintiff for requesting leave). Therefore, Defendants motion for summary judgement on Helwig's FMLA retaliation claim in Count VII is **GRANTED**. (Doc. 42).

F.  SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S HARASSMENT AND HOSTILE WORK ENVIRONMENT CLAIMS.

In Count V, Helwig asserts claims of harassment based on her gender resulting in a hostile work environment. (Doc. 1, ¶¶ 124-28). Defendants contend that Helwig cannot show gender-based harassment because she has not demonstrated that she was discriminated against based on her sex. (Doc. 44, at 32). Defendants also aver that Myers' conduct could not reasonably be considered severely or pervasively discriminatory. (Doc. 44, at 32). Helwig counters that her complaints to Parsnik of gender discrimination at Misericordia and others'

complaints of an "Old Boy's Club" at Misericordia are substantial evidence such that a reasonable jury could find harassment and a hostile work environment. (Doc. 57, at 48-49).

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citing *Meritor Sav. Bank, FSB v. Vinson*, 447 U.S. 57, 67 (1986)). To state a prima facie case of hostile work environment under Title VII, Helwig must show, "(1) [she] suffered intentional discrimination [in a work environment] because of [her] sex; (2) this discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Mandel*, 706 F.3d at 167. To determine whether a work environment is hostile, courts look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; an whether it unreasonably interferes with an employee's work performance." *Moody v. Atl. City Bd. Of Educ.*, 870 F.3d 206, 215 (3d Cir. 2017) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)); *see also Drinkwater v. Union Carbide Corp.*, 604 F. 2d 853, 863 (3d Cir. 1990) ("Hostile work environment harassment claims must demonstrate a continuous period of harassment."). Title VII protects against harassment based on discrimination against a protected class only and does not extend relief for general workplace harassment or strained supervisor-employer relationships. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80-81

(1998); *Ismail v. McDermott Int'l Inc.*, No. 3:19-cv-1305, 2024 WL 1094685, at *5-*6 (M.D. Pa. 2024).

While Helwig fails to allege specific facts showing harassment in her complaint, in her deposition, she alleges two specific actions constituting harassment: (1) Myers repeatedly bringing up the February 7th email sent to Smith-Mileski, and (2) Myers' requests that Helwig meet with him to discuss the terms of her departure from Misericordia. (Doc. 43-1, at 54-55; Doc. 44, at 30-31). Neither of these specific acts describe "frequent, physically threatening, of humiliating harassment." *See Ismail v. McDermott Int'l Inc.*, No. 3:19-cv-1305, 2024 WL 1094685, at *5-*6 (M.D. Pa. 2024) (finding a series of emails and meetings criticizing employee's work performance did not constitute a hostile work environment under Title VII). Additionally, Myers only discussed the February 7th email with Helwig when it was sent and when discussing Helwig's termination in the following weeks. (Doc. 44, at 32; Doc. 43, ¶¶ 66, 73, 90-94, 112-117, 130-135, 146-148, 154; Doc. 58, ¶¶ 73, 90-94, 112-117, 130-135, 146-148, 154). The frequency and severity of Myers conduct towards Helwig is more indicative of a strained supervisor-employer relationship than a hostile work environment. *See Ismail,* 2024 WL 1094685, at *5-*6; *see also Drinkwater v. Union Carbide Corp.*, 604 F. 2d 853, 863 (3d Cir. 1990) ("Hostile work environment harassment claims must demonstrate a continuous period of harassment."). Taking all inferences in favor of Helwig, there is no genuine dispute of material fact for trial as to whether Misericordia was a hostile work environment. Therefore, Defendants motion for summary judgement on Helwig's claim of gender-based harassment constituting a hostile work environment in Count V is **GRANTED**. (Doc. 42).

G.    MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON HELWIG'S FMLA CLAIMS.

### a. Material Issues of Fact Preclude Summary Judgment on Helwig's FMLA Failure to Notify Claim.

In Count IV, Helwig alleges that Misericordia failed to provide her with the required notices to employees who may need leave for their own serious health condition as required under the FMLA. (Doc. 1, ¶ 117). Defendants argue that Helwig did not provide Misericordia with notice of her intent to take FMLA leave until she had already been terminated. (Doc. 44, at 36-37). Helwig contends that Misericordia failed to provide her with notice of her rights under FMLA when she took a two-week sick leave in February 2022 and again when Helwig emailed Human Resources her intention to submit FMLA leave paperwork on March 9, 2022, her last effective date of employment. (Doc. 57, at 45).

The FMLA allows eligible employees to take job-protected, unpaid leave in certain circumstances, including when an "employee's own serious health condition makes the employee unable to perform the functions of his or her job." 29 C.F.R. § 825.100(a); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 391 F.3d 294, 303 (3d Cir. 2021). To ensure workers are aware of FMLA protections, covered employers are required to give several types of FMLA notice provisions to their employees. 29 C.R.F. § 825.300. The parties dispute whether Misericordia provided Helwig with eligibility notice as required by the FMLA. (Doc. 44, at 36-37; Doc. 57, at 45). Eligibility notice arises when an employee requests FMLA leave or "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." 29 C.R.F. § 825.300(b)(1); *Lichtenstein*, 691 F.3d at 303-04. In such circumstances, the employer must notify the employee of her eligibility to take FMLA leave within five business days of the employee's request or "when the employer acquires knowledge that an employee's leave may be for an FMLA qualifying reason." 29 C.R.F. §

825.300(b)(1). In conjunction with eligibility notice, an employer must provide the employee with notice of her rights and responsibilities, which must be in writing. 29 C.R.F. § 825.300(c).

The employee, not the employer begins the process of obtaining FMLA leave by either explicitly stating a need to take FMLA leave or providing facts and circumstances suggesting to the employer that leave is needed. 29 C.R.F. § 825.301(b). To suggest leave is needed, an employee may need to share private information with their employer such the diagnosis of a particular condition. *Lichtenstein*, 691 F.3d at 303. Calling out sick without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act. 29 C.R.F. § 825.303(b); *see also Wilson v. Kuhn's Quality Foods*, No. 05-511, 2006 WL 2709384, at *10 (W.D. Pa. Sept. 20, 2006) (citing Collins v. NTN-Bower Corp., 272 F.3d 1006, 1009 (7th Cir. 2001) (finding an employee's reference to being sick does not suggest to the employer that FMLA could be applicable).

On March 9, 2022, when Helwig notified Misericordia of her intent to submit FMLA paperwork, Misericordia did not need to provide Helwig with eligibility notice because it is undisputed that March 9th was Helwig's last effective day of employment, and entitlement to FMLA benefits end when employment ends. (Doc. 43, ¶ 157; Doc. 58, ¶ 157; Doc. 43-6, at 116); 29 C.F.R. § 825.102; *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007) ("to assert a claim of interference, an employee must show that [she] was entitled to benefits under the FMLA"). However, on March 3, 2022, when Helwig submitted the return to work note from her doctor, the disclosure of her leg operation in the note may have provided sufficient notice to trigger Misericordia's obligations under 29 C.R.F. § 825.301(b). (Doc. 43, ¶ 126; Doc. 58, ¶ 126); 29 C.R.F. § 825.300(b)(1); *Lichtenstein*, 691 F.3d at 303 (finding an employee need not provide every detail necessary for the employer to verify if the

FMLA applies). Therefore, there is a material dispute of fact for trial as to whether, notice of Helwig's leg operation triggered Misericordia's notice obligations under the FMLA. Accordingly, Defendants motion for summary judgment on Helwig's FMLA failure to notify claim in Count IV is **DENIED**. (Doc. 42).

### b. Material Issues of Fact Preclude Summary Judgment on Helwig's FMLA Interference Claim.

In Count IV Helwig alleges that Myers and Misericordia intentionally interfered with Helwig's rights under the FMLA when they terminated her employment. (Doc. 1, ¶ 118). Defendants assert that Helwig was aware that her last day was imminent at the time of her notice to Misericordia, and that she had already been terminated at the time she submitted her FMLA paperwork. (Doc. 62, at 26). Helwig contends that although Myers may have been unaware of Helwig's heath condition and FMLA request, he consulted with Parsnik who did have such knowledge. (Doc. 57, at 46).

To survive a motion for summary judgment on an FMLA interference claim, a plaintiff must present evidence establishing that:

> (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which she was entitled under the FMLA.

> *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014) (citing *Johnson v. Cnty. Coll. Of Allegheny Cnty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008).

The parties dispute the third, fourth, and fifth elements. (Doc. 57, at 45-47; Doc. 62, at 25-26). As Helwig's notice requirements are fully explained in Section G, subsection a supra, the Court will focus on the third and fifth elements of the FMLA interference claim.

An employee' entitlement to FMLA leave is limited by 29 U.S.C. § 2614(a)(3)(B), which provides that an employee is not entitled to a right, benefit, or position that she would

not "have been entitled had the employee not taken the leave." *Atchson v. Sears*, 666 F. Supp. 2d 477, 488-89 (E.D. Pa. 2009) (citing *Yandrisevitz v. H.T. Lyons, Inc.*, No. 08-1444, 2009 WL 2195139, at *9 (E.D. Pa. July 22, 2009) (quoting 29 U.S.C. § 2614(a)(3)(B)). Accordingly, "[a]n employee lawfully may be dismissed preventing [her] from exercising [her] statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Atchson v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) (quoting *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 488 (6th Cir. 2005)). Additionally, "[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Reinhardt v. Mineral Techs. Inc.*, No. 05-4203, 2006 WL 4050695, at *13 (E.D. Pa. Nov. 27, 2006); *see Champion v. Spencer Gifts, LLC*, No. 08-CV-689, 2009 WL 3131461, at *6 (D.N.J. Sept. 24, 2009).

The parties dispute whether Myers decided to terminate Helwig before their initial meeting about the February 7th email on February 16, 2022, or at the March 3, 2022 meeting where Myers presented Helwig with a draft separation agreement. (Doc. 43, ¶ 82; Doc. 58, ¶ 82). Defendants contend that Myers notified Helwig of her termination on February 16, while Helwig contends that Myers first notified her of her termination on March 3. (Doc. 43-1, at 29; Doc. 43-2, at 51-52, 56-57; Doc. 46-17, at 4-9, Doc. 58, ¶ 81). Therefore, Helwig was not denied FMLA leave or benefits to which she was entitled when she gave notice of her intent to submit FMLA paperwork on March 9, 2022, because there is undisputed evidence that Myers made the decision to terminate her, at the latest, six days earlier. (Doc. 43, ¶ 130; Doc. 58, ¶ 130, Doc. 43-1, at 29; Doc. 43-2, at 56-57; Doc. 46-17, at 4-9); *see Atchinson v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) (holding plaintiff's interference claim fails because of

evidence that employer made the decision to terminate the plaintiff weeks before he requested FMLA leave). However, as discussed fully in Section G, subsection a supra, Helwig may have provided adequate notice to Misericordia of her need for FMLA leave when she submitted her doctor's note and disclosed her leg operation after returning from medical leave on March 3, 2022. (Doc. 43-1, at 122). Given the dispute of material fact regarding the date Helwig was notified of her termination, a reasonable jury making inferences in favor of Helwig, could find that Defendants interfered with Helwig's rights under the FMLA. Accordingly, Defendants motion for summary judgment on Helwig's FMLA interference claim in Count IV is **DENIED**. (Doc. 42).

H.  SUMMARY JUDGMENT IS GRANTED AS TO HELWIG'S DEFAMATION CLAIM.

In Count VII, Helwig alleges a claim of defamation against Myers for allegedly telling the Misericordia community that Helwig had been "terminated effective immediately." (Doc. 1, ¶¶ 147-58). Defendants assert that Myers has the absolute defense of truth because Helwig did leave Misericordia effective immediately on March 9, 2022 as reflected in the communications to the Misericordia community. (Doc. 44, at 37). Helwig counters that Myers' choice of words in his communications led members of the Misericordia community to believe that she was terminated for bad acts as referenced in the Misericordia Separation from Employment Policy. (Doc. 57, at 16).

A defamatory statement under Pennsylvania law is one that "tends to harm another's reputation by lowering [her] in the eyes of the community or by deterring third persons from dealing or associating with [her]." *Fort Washington Resources, Inc.*, 846 F. Supp. 354, 364-65 (E.D. Pa. 1994); *Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp.2d 692, 706 (M.D. Pa. 2010). Under Pennsylvania law, a claim for defamation includes the following elements, "(1)

the defamatory nature of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from publication; and (7) abuse of conditionally privileged occasion." *Mun. Revenue Serv., Inc.*, 700 F. Supp. 2d 692, 706 (3d Cir. 2010) (citing *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267-68 (Pa. Super. Ct. 2005)). Pennsylvania law provides that truth is an absolute defense to a defamation claim. *Emekekwue v. Offer*, 26 F. Supp. 3d 348, 352 (M.D. Pa. 2014). To determine whether a statement is substantially true, "the test is whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982); *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014).

On March 9, 2022, continuing into the morning of March 10, 2022, Myers issued a series of announcements to the Misericordia community which stated, in relevant part, "I write to inform you that Sue Helwig, Vice President of University Advancement, is leaving Misericordia University, effective immediately." (Doc. 43-3, at 28-29). It is undisputed that Helwig's last effective day of employment was March 9, 2022, and thus, Myers' statements that Helwig was leaving Misericordia were truthful. (Doc. 43, ¶ 157; Doc. 58, ¶ 157). Therefore, there is no genuine dispute of material fact as to defamation because Myers' statements to the Misericordia community were truthful. *See Emekekwue*, 26 F. Supp. 3d at 352 (M.D. Pa. 2014) (finding truth is an absolute defense to a defamation claim under Pennsylvania law). Accordingly, Defendants' motion for summary judgment on Helwig's claim of defamation in Count VII is **GRANTED**. (Doc. 42).

IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**. (Doc. 42). Defendants' motion is **GRANTED** as to Counts I, II, II, and VI. Helwig's claims of age discrimination, sex discrimination, and disability discrimination and harassment are **DISMISSED**. Defendants' motion is **GRANTED** as to Count VII. Helwig's claims of ADA, ADEA, PHRA, and FMLA retaliation are **DISMISSED**. Defendants' motion is **GRANTED** as to Count V. Helwig's claims of harassment and hostile work environment are **DISMISSED**. Defendants' motion is **DENIED** as to Counts IV of FMLA failure to notify and FMLA interference. Finally, Defendants' motion is **GRANTED** as to Count VII. Helwig's claims of defamation are **DISMISSED**.

An appropriate Order follows.

**Dated: January 15, 2026**               *s/ Karoline Mehalchick*
                                          **KAROLINE MEHALCHICK**
                                          **United States District Judge**